No. 13,683.

S. R. PRENTISS vs. JOHN J. LYONS ET AL.

SYLLABUS.

1. Where an answer to an appeal, asking for an amendment of the judgment, is not filed three days before the first fixing of the cause for argument it will not be considered.

2. The provisions of a contract, like those of a statute, are to be construed together so as to give effect to all, if it be possible to do so. But where a particular provision is in irreconcilable conflict with the letter and spirit of the contract, taken as a whole, and the evidence shows that the presence of such provision is attributable to accident rather than design, and that it is meaningless and without application, it will be regarded as not written.

Prentiss vs. Lyons et al.

3. Where, by the terms of a contract, payments are to be made on the first day of every month, but the party to whom they are due has notified the other that he does not intend to be exacting about it, and in point of fact, during perhaps six consecutive months, no payment is made on the first day of the month, the party owing the payments will not be held to have forfeited his rights under such contract by failure to pay upon the first day of the seventh month.

ON REHEARING.

In injunction proceedings, the delay of a few days in matter of cutting down trees and hauling them to the market is not of itself ground for damages, particularly as it appears that the delay occasioned did not result in parties losing on the value of their logs.

The profits claimed by defendants are not shown to an extent sufficient to make them the basis of a decree for damages. The item of damages growing out of asserted profits that would have been realized is disallowed.

APPEAL from the Fifteenth Judicial District, Parish of Calcasieu— *Miller, J.*

*R. P. Williams,* for Plaintiff, Appellant.

*Pujo & Moss,* for Defendants, Appellees.

The opinion of the court was delivered by MONROE, J.

On application for rehearing by BREAUX, J.

STATEMENT OF THE CASE.

MONROE, J. Plaintiff, alleging that a contract under which the defendants were cutting timber from certain lands owned by him in Calcasieu parish had expired by limitation, or, in case that it should be held not to have expired, that it had become void by reason of noncompliance on the part of the defendants, brought this suit to have it so declared, to restrain the further cutting, and to recover for timber said to have been cut before, and after, the alleged expiration, or forfeiture, of said contract; and he caused a preliminary injunction to issue, restraining the defendants from proceeding with such cutting during the pendency of the suit. The defendants claim that the contract in question has neither expired nor become void, and allege that they are entitled to proceed with the cutting of timber agreeably to its provisions. They further allege that by reason of the injunction they have sustained certain losses up to the date of the filing of their an-

swer, and have been otherwise injured by the charge of trespassing cir-- culated against them by the plaintiff, upon which accounts they set up a claim in reconvention.

There was a verdict and judgment sustaining the defendants' inter- pretation of the contract and awarding them $812 for the loss of profits occasioned by the injunction, and also allowing the plaintiffs for 270,474 feet of timber, which was found to have been cut and scaled, but not paid for. From this judgment the plaintiff has appealed. The case was set down for argument in this court December 3rd, 1900, but was continued upon the motion of the counsel for the defendants. Upon December 31st, following, an answer to the appeal was filed, "without prejudice", in which the defendants ask that the judgment be amended by increasing the amount of the award, in their favor.

It appears from the record that the plaintiff resides in Maine and has no other occupation than the handling of timber lands, mainly belong- ing to himself and his family, and situated in Maine, in Louisiana, and probably elsewhere. For the purposes of this business, as conducted in Maine, he seems to have been in the habit of using a printed form of contract, the blanks in which would be filled up as occasion might re- quire. Precisely how the negotiations were begun which resulted in the establishment of business relations between him and the defendants does not appear, nor is it material. It is sufficient to say that it had come to be understood between them, doubtless by correspondence, that the defendants were willing to pay at the rate of two dollars per thou- sand feet for the privilege of cutting timber from about 900 acres of the land owned by the plaintiff in the parish of Calcasieu, and that the plaintiff was willing that they should do so. This was, probably, in March, 1899, and the plaintiff, who had never met the defendants, and had not been in Louisiana since about the year 1892, filled up, according to his ideas, one of the blank contracts, or "permits", as he calls them, which he was in the habit of using in Maine, and forwarded it by mail to the defendants, for their consideration and approval. The defend- ants thought proper to make certain changes in the projet thus submit- ted, and accomplished it by copying the instrument, including the printed matter, and embodying the changes in the copy, which they signed, and enclosed to the plaintiff in a letter dated April 3rd, 1899, suggesting at the same time that he, in turn, should make such correc- tions as he thought proper and submit the same to them. Upon April 6th, accordingly, the plaintiff wrote:

"Enclosed, I hand you back one copy of the permit, rec'd this morn-
"ing, with some interlinings and additions that seem to me essential,
"signed by me, and if it meets your view you can go to work at once and
"then send it back to me and I will make the same changes in the
"other copy and send it back to you, signed. Your clause about a new
"permit was too sweeping, and might be considered to mean all my
"lands in Calcasieu parish. I will gladly give you a new permit when
"you are through with this one, but I want to get acquainted with you
"first, and see how we come out on this one, and I shall come down to
"La., and meet you personally before that. Don't be scared at the de-
"fault of payment clause. I shall not jump on you if anything unex-
"pected or unavoidable happens."

This amended offer, which was signed by the plaintiff as of date
April 7th, 1899, appears to have been accepted by the defendants and
was signed by them accordingly.

The contract, as thus made, contains the following, among other
provisions, to-wit: "This agreement or conditional license, or permit,
"* * * witnesseth:

"1st. That the said party of the first part hereby grants permission
"to the said second parties, during the ensuing logging season only, to
"enter with teams upon the east half of the northwest quarter * *
"* in the parish of Calcasieu * * * and to cut and remove
"therefrom all of the merchantable yellow pine timber thereon 'of the
"dimensions hereinafter stated, upon the following terms and condi-
"tions, to-wit:

"2nd. Said second parties shall cut and remove therefrom all the
"merchantable pine timber within the compass of the land hereinbe-
"fore described, as they progress, having a diameter * * * for
"which said yellow pine timber said second parties shall pay to said
"first parties two dollars per thousand feet * * *"

"3rd. Said payments shall be made in cash, by New York or Boston
"exchange, on the first day of each month, for all timber shipped dur-
"ing the previous month, and if default shall be made on any payment,
"then the said party of the first part, Prentiss, may declare this license,
"or permit, void."

"4th. Said second parties agree to ship 150,000 to 300,000 feet per
"month, and more if possible.

*       *       *       *       *       *       *

"6th. It is further agreed that all timber cut under this contract

" shall be scaled and measured by some competent person mutually
" selected by the parties hereto.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

" 7th. &ast; &ast; &ast; it shall be the duty of said scaler upon the meas-
" urement of any logs by him to furnish statements thereof to each of
" the parties hereto, which scale and measurement when so made shall
" be final and conclusive.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

" 9th. It is further stipulated that when the said second parties
" shall have denuded the above described lands of all the yellow pine
" timber of the dimensions and qualities hereinbefore set forth, they
" are hereby granted the privilege of having a new permit upon some
" of Prentiss' adjoining lands.

" 10th. It is further agreed that, when all the logs of the dimensions
" and quality hereinbefore set forth have been cut from the above de-
" scribed lands, the said second parties shall pay for those not shipped,
" by the measurement and at the price above specified, and shall be
" allowed ninety days from said final settlement within which to remove
" said logs," etc.

It is admitted that the land embraced in the contract contained about
8,000,000 feet of timber such as the contract calls for, and that the
plaintiff has over 20,000 acres besides in the parish of Calcasieu. The
parties agreed upon a scaler and the work of cutting timber went on
to the apparent satisfaction of both sides. The remittances called for
were not forwarded exactly upon the first day of each month but there
was no complaint on that score from the plaintiff, save once, when
there was an unusual delay in remitting for the timber shipped in July,
which delay is explained by the fact that the scaler did not furnish the
figures. In the month of October, the plaintiff came to Louisiana and
visited the defendants, and their camp upon his land. He had some
conversation with them about the manner in which the timber was cut,
and indulged in the criticism that there was some waste and that the
trees should be cut nearer the ground, and that the sawyers should work
on their knees, with pads under them. But he was informed that the
sawyers in Calcasieu would not work in that way. He also rather
urged that the defendants should accept, and pay for, a certain quality
of timber designated as "red heart," which he was informed was abso-
lutely unmerchantable. There was, however, nothing unpleasant be-
tween him and the defendants and he appeared to be satisfied that they

were complying with their contract, so that, as he was about leaving for his home, in November, 1899, he said to them, "just go ahead and take such timber as you wish and try to prevent waste." The next communication which the defendants received from him was a letter, dated at Bangor, Me., December 11, 1899, in which, after acknowledging the receipt of a check, and referring to the men who had been employed as scalers, he wrote: " I had expected, when I made the permit, " that you would have taken the timber cleaner and not left so much " on the ground, but we have talked that over before, and I shall not " make any fuss about it as the time left is so short and you will prob- " ably not cut more than 150,000 feet this month, anyway, and I wish " you would confine yourself to the ground you are already cutting on " and not commence on any new 40 during the balance of the month, " and stop cutting entirely on the thirty-first, and if the wet weather " bothers, you need not continue to cut the rest of the month, but can " stop now if you wish to. I suppose your logging season probably " terminates in November, but as the month is so far advanced, it may " as well run through to the end of the year." To this the defendants replied, December 19th, saying, "Yours of the 11th instant reached " us in due course of mail and we must say that we are very much sur- " prised at its contents, especially whereby you notify us that our con- " tract to cut and remove the timber off the land described therein will " expire on the thirty-first of the month. When you visited us during " the month of November you made no mention of your desire or inten- " tion to attempt to abrogate our contract, but, on the contrary, stated " that you wanted us to go right ahead and take the timber. We con- " sider that you have no right to abrogate, amend, or modify our con- " tract * * *. On the faith of this agreement, and contract, we " have expended large sums of money. * * * . Our contract clearly "'states that we *shall* cut and remove *all* the mer'c't. yellow pine timber " on the land described therein, and had this provision not been in the " contract we should not have signed it. We expect to cut and remove " all the timber from said lands and to pay for the same in accordance " with our agreement," etc.

To this the plaintiff replied, by letter dated December 26th, saying: " I am surprised that you should consider the permit as perpetual when " the first clause in it distinctly states that it is for the 'ensuing log- " ging season only', and that means the ensuing Spring, Summer and " Fall, which is the logging season in La. Logs *can* be cut in the win-

" ter down there, but that is not the usual logging season, which begins
" in the Spring and ends in the Fall, and every lumber man and mill
" man and business man of whom I asked the question gave but one
" answer, that the logging season was in the summer and not in the
" winter, * * * at all events, whether you are convinced or not,
" *do not cut down another tree after Dec. 31st,* as I forbid it until this
" matter is settled, but you can go on hauling what you have cut."

This was followed by a letter dated Jan. 10, 1900, in which the plain-
tiff says: " The payment for timber shipped from my land during the
" month of December, 1899, * * * not having been made on Jan.
" 1st, 1900, or received as specified in the third clause of said permit, I
" hereby declare the license, or permit, void." To which the defendants
replied, Jan. 22, 1900: "We noted in your's of the 10th, 1900, that you
" claim our contract with you for timber lands void for the reason
" that we did not pay ——— for December scale on January 1st, 1900;
" it was impossible to send it on the first as the scale was not finally
" made out until later, and as you had accepted such payments, in the
" past, after the 1st, you now have no right to declare the contract void
" without previous notice before the end of the month. We have one of
" your letters in which you said you would not exact impossibilities; it
" appears now that you do."

No further steps appear to have been taken by the plaintiff at that
time, and the defendants went on cutting timber and remitting for the
same; the plaintiff receiving the remittances, as he says, "on account",
until April 10, 1900, when the plaintiff visited Calcasieu and instituted
this suit.

Upon the subject of his understanding of what is meant by the term
"logging season", the plaintiff gives the following testimony at different
times in the course of his somewhat protracted examination: He states
that he consulted an attorney when he was in Calcasieu, in November,
and submitted to him the contract between defendants and himself in
order to obtain information as to a particular clause, and the cross-
examination proceeds thus:

" Q.—There was no question about the logging season?

" A.—Yes, sir; I talked to a number of people, I say so in the letter,
I did not know prior to that time that it was possible to haul a log in
the winter, did not know it could be done.

" Q.—What is your logging season in Maine?

" A.—We call it generally a logging year. Up there it begins in the

fall of one year and runs into the winter of the next. It is in two years, it begins in November and runs as late as April."

At another place we find:

" Q.—At the time of the execution of this license or permit, Mr. Prentiss, what did you understand it to mean by the term 'logging season', in this country, and what meaning did you intend to convey by signing an agreement with that expression in it?" (This question was objected to by the counsel for the defendants, and the objection having been overruled the witness answers).

" A.—I meant spring, summer and fall—the dry season, up to December 31st—not the whole year, but just a part, from the time of the permit date until the rain should commence and it was so wet in the woods that they could not haul to advantage, and not later than the end of the year.

" Q.—Would you, at that date, have signed a permit for a longer period than the end of the year?

" A.—I would not."

At still another place:

" Q.—When do you have your logging seasons in Maine, and explain them?

" A.—It begins in October and extends till the following April.

" Q.—You mean the logs are cut then?

" A.—They are cut and piled in the woods.

" Q.—When are they cut?

" A.—In October, November and December.

" Q.—When are they hauled to market?

" A.—They are hauled to the streams in January, February, March, and April, they are hauled on sleds, in the snow."

The defendants testify that they expended fifteen hundred to two thousand dollars to equip themselves for the purposes of the contract with the plaintiff and that they would not have entered into said contract for the limited period which the plaintiff claims to have been covered by it. A number of witnesses were examined with a view of ascertaining whether there is any such thing as a "logging season" known in the parish of Calcasieu. And, almost, if not quite, without exception, they testified that they had never heard the term used until they heard it in connection with this suit. It was also shown that there is not a person or firm engaged in the timber business in that part of the country that does not prosecute the work of getting out timber continuously

from one year's end to the other.   Three witnesses, who were examined for the plaintiff, undertook to testify as to the season of the year to which the term "logging season" should, or might, be applied, but they differed upon the subject, neither undertaking to say that, as a matter of fact, the term is ever used or applied, and they all admit that "logging", in Calcasieu, is carried on throughout the year.   And quite a large number of witnesses, examined on behalf of the defendants, testify to the same effect.   Upon the subject of the damage claimed by the defendants, the evidence shows that their operations had been held up by the injunction, at the time of the filing of their answer, for thirty-five days, during which they were at the expense of paying certain of the employees, and feeding their stock, and that had they not been so arrested they would have made enough to have paid their laborers, fed their stock, and put twenty-three 20-100 dollars, per day, as profits, into their pockets.   The amount allowed by the judgment to the plaintiff is not disputed.   From the particular expression out of which this suit may be said to have arisen, i. e. "during the ensuing logging season only", as incorporated in the printed matter contained in the forms used by the plaintiff in Maine, one of which was sent out here and served as the basis of the contract entered into between the parties litigant, and from other language in the said printed matter, it is evident that contracts usually made upon such forms do not contemplate the absolute denuding of the lands to which they relate, of its timber.

## OPINION.

The answer to the appeal and the prayer for the amendment of the judgment not having been filed three days before that upon which the case was first fixed for argument, cannot be considered.   C. P. 890. Converse, Kennett & Co. vs. Str. Lucy Robinson, 15th Ann. 433; Barrett vs. Donovan, 17th Ann. 182.

On the merits, it is plain that the serious question in the case is, what effect, if any, is to be given to the language which limits the operation of the contract between the plaintiff and defendants to the "ensuing logging season only"?   From the statements which have been made, it is apparent that the contract in question must be regarded as having been made in the parish of Calcasieu, to be executed there.   And it is equally apparent that the term "logging season" is practically unknown in that parish, in which, although the getting out of timber is an important industry, not an individual was to be found to assert that he

Prentiss vs. Lyons et al.

ever heard of its being used in a contract, that he would understand definitely what was intended if it were used, or that there is any person or firm engaged in "logging" in said parish, who does not "log" continuously, as well at one season of the year as at another.  The language as used is therefore without application, and if the contract had been altogether prepared by persons living and engaged in the timber business in the parish of Calcasieu, its presence therein would be difficult of explanation.  But we have seen that the form, or *projet,* upon which the contract in question was built, was sent by the plaintiff from Maine, where the term "logging season" has meaning and application, and that said term was printed therein, as part of a formula in common use, in Maine, which explains where it came from, but leaves for explanation why it was left in a contract which was to be executed in the parish of Calcasieu, where it has no meaning or application.

The burden of this explanation rests upon the plaintiff, since, as between him and the defendants, the term originated with him.  And the explanation offered, *i. e.,* that it was intended to apply to a known condition, or custom, existing in the place where the contract was to be executed is unsatisfactory, because it is not supported by the fact, and because a further explanation is at once required.  There is, as we have seen, no "logging season" in Calcasieu; but if there were, how could the limitation of the term of the contract to the logging season, which the plaintiff professed to believe terminated in November, 1899, be reconciled with the several provisions of the contract which call for the cutting and removal of *all* the merchantable timber, and the *denuding* of the land, to be followed by a similar contract with respect to other lands owned by the plaintiff?

It will be observed that whilst the words "the ensuing logging season only" find their way into said contract as part of the printed form used as a model, and which was sent by the plaintiff from Maine, there is other language, and there are other conditions incorporated in said contract, which were deliberately written therein as original matter, and which distinctly express the idea that the defendants are to take *all* the merchantable timber on the 900 acres in question, of a certain quality. Thus, in the first paragraph, in which the "logging season" is mentioned, it is said that the defendants are to remove "all the merchantable yellow pine timber thereon upon the conditions hereinafter stated".  In the second paragraph, it is stated: "Said second parties shall cut and remove therefrom all the merchantable pine timber within the compass

of the land hereinbefore described, as they progress, having a diameter," etc. In the fourth paragraph, we find, "Said second parties further agree to ship from 150,000 to 300,000 feet per month, and more if possible."

The ninth paragraph reads: "It is further stipulated that when the said parties shall have denuded the above described lands of all the yellow pine timber, of the dimensions and qualities hereinbefore set forth, they are hereby granted the privilege of having a new permit on some of Prentiss' adjoining lands". The tenth paragraph reads: "It is further agreed that, when all the logs of the dimensions and quality hereinbefore mentioned have been cut from the above described lands, the said second parties shall pay for those not shipped * * * and shall be allowed ninety days from said final settlement within which to remove said logs from the forest." Etc.

In connection with these provisions there is, also, to be considered the statement in the plaintiff's letter of April 6th, 1899, viz: "Your clause about a new permit was too sweeping, and might be construed to mean all my lands in Calcasieu parish; I will gladly give you a new permit when you are through with this one", etc. The plaintiff knew perfectly well, and he admits it in his testimony, that there were eight million feet of lumber on the land which was affected by the contract, and he also knew that the contract required the defendants to take not less than one hundred and fifty thousand feet and not more than three hundred thousand feet per month, so that there was no probability of their denuding said land, or getting through with the contract into which they were entering within the few months which he now claims constitute the logging season. Again, it would have been a most remarkable thing if the plaintiff, believing that the contract had about expired when he visited the defendants, in November, 1899, had discussed with them their method of cutting, the questions of their taking "red heart" as merchantable timber, and other matters, and had finally left, telling them to go on with their cutting and not to waste more than they could help, or something to that effect, without saying a word about the contract having expired, or being about to expire, or about the duration of the logging season. All of these circumstances lead us to conclude that the "logging season" expression was left in the contract rather by accident than design, and that it must be considered as overborne by the other stipulations, to which attention has been called.

As to the claim that the defendants forfeited their rights, by failure

to pay, on January 1, 1900, for the lumber shipped by them during December, 1899, it is clearly too inequitable to be entertained. The defendants had complied with the spirit of their agreement by forwarding their remittances a few days earlier or later as they got the figures from the scaler, who was the common agent to whom they were obliged to look, and the plaintiff had been content. And he cannot be allowed to start up suddenly, after thus throwing the defendants off their guard, and exact the forfeiture of their rights as a penalty for something in which up to that time he had acquiesced. Bigelow on Estoppel, 5th Ed., p. 660.

Finding no error to the prejudice of the plaintiff in the judgment appealed from, the said judgment is affirmed.

## ON APPLICATION FOR A REHEARING.

BREAUX, J. We have re-examined the issues heretofore decided. Having considered the grounds urged for a rehearing, we have not found there was error in deciding the principal questions as we have in our original judgment. With reference to issues of comparatively unimportant consequence, we can only say, in answer to plaintiff's petition for a rehearing, that an absolute right was granted by plaintiff to defendant for consideration stipulated, to enter upon plaintiff's land in question to remove pine timber described, on conditions stipulated.

This court has not found that this right of removal is, or that it should be limited to the "logging season" words of the contract of no special meaning; referring to a season unknown here to lumbermen and others interested in timber lands. To have the right of putting an end to the right granted to remove all the timber on the land in question, after a certain time, the limitation must be expressed in language clear and precise.

The remittances as made by defendant to plaintiff, at stated times, are not found fault with on the application for a rehearing, and it seems no longer ground for argument. It is not referred to in plaintiff's brief for a rehearing.

We take up for consideration that portion of the judgment which allows defendants damages in the sum of eight hundred and twelve dollars, asserted loss of profit on timber for fifteen days in April and twenty days in May at twenty-three and 20-100 dollars per day: All parties concerned agree that this amount is exclusively for the alleged loss of profit on the timber for thirty-five days.

The facts bearing on this particular point are, that plaintiff had obtained an injunction prohibiting defendants from cutting down any of the timber on any of the land described in their written agreement. This injunction stopped them from working during the short time we have before mentioned. We make no question but it would have been proper to allow for the profit defendants allege they would have made if it appeared that they have been forever kept out of the profit. This is not the case here. The injunction only had the effect of deferring the earnings of profit for a few weeks. The trees during the short delay were not cut down; their value was not lessened in any way. Immediately after the injunction had been dissolved, defendants resumed operations and earned whatever profits there were in the business. They claim specifically for profits lost and not for expenses incurred while waiting to have the injunction dissolved.

In view of this, they have, we think, no right to damages on this ground. We must decline to grant judgment for profits that are not lost, but which are to be realized upon timber which has been returned to plaintiff's possession. To the extent that our decree heretofore allowed eight hundred and twelve dollars, it will be amended.

With reference to the right reserved to sue plaintiff on his injunction bond, "without restriction", we quote from plaintiff's brief: "Whatever right defendants had was reserved and if plaintiff has any right to urge, it can be heard when suit will be brought on the bond." We will not take up that question for decision in this case. Returning to the claim of eight hundred and twelve dollars, it was fully argued at bar. We are thoroughly convinced that it should not be allowed, and we therefore will not grant a rehearing, and we therefore make the comparatively inconsiderable amendment at this time.

It is therefore ordered, adjudged, and decreed that the judgment appealed from is amended by striking therefrom that portion allowing to defendants the sum of eight hundred and twelve dollars and interest in damages and, as amended, the judgment is affirmed at appellee's costs.

To the defendants and appellees are allowed the usual delays in order to permit defendants and appellees to apply for a rehearing only as relates to the said amount of "eight hundred and twelve dollars and interest"—the judgment being final in all other respects.

Judgment amended and rehearing refused except as before mentioned.

PROVOSTY, J., takes no part.