TENNESSEE FERTILIZER CO. *et al. v.* INTERNATIONAL AGR.
CORPORATION.*

(*Nashville.* December Term, 1921.)

1. **SALES.** Seller cannot cancel contract after accepting incomplete
    performance without giving notice to buyer.

Where a seller is entitled to a strict compliance with the contract,
    but accepts irregular and incomplete performance by the buyer,
    he cannot insist upon complete performance, or cancel the con-
    tract for the defaults of the buyer, without giving notice of such
    intention to the buyer, and allowing him a reasonable time in
    which to perform. (*Post pp.* 460, 461.)

Cases cited and approved: Wildberg Box Co. v. Darby, 143 Tenn.,
    73; Gibson v. Rouse, 81 Wash., 102-107; Prentiss v. Lyons, 105
    La., 382; Taylor v. Goelet, 208 N. Y., 253; Monson v. Bragdon,
    159 Ill., 61-67; Wilt v. Hammond et al., 179 Mo. App., 406; Hen-
    ningsen v. Tonopah, etc., R. Co., 33 Nev., 208-257.

2. **SALES.** Letter from seller to buyer held not a notice of seller's
    intention to cancel contract on nonperformance.

A letter from the seller that: "We hereby tender you sulphuric
    acid due you as per the terms of your contract. Kindly furnish
    us with shipping orders at once, and oblige"—written to the
    buyer after incomplete and irregular performance by the buyer,
    was not a notification of the seller's intention to cancel the con-
    tract. (*Post, pp.* 461-463.)

3. **SALES.** Buyer's intention to resell, where not known to seller,
    held immaterial on measure of damages for failure to deliver.

The measure of damages for seller's breach of contract to deliver
    is the difference between the contract price and the market price
    at dates of delivery fixed by the contract, and, where resale by
    buyer was not in the parties' contemplation at the time the con-
    tract was made, the price at which the buyer had contracted to
    resell to another has no bearing. (*Post, pp.* 463-471.)

---

*On measure of damages for breach of contract by failure to de-
liver goods, see note in 52 L. R. A. 225.

Tenn. Fertilizer Co. v. Int. Agr. Corp.

Cases cited and approved: Cement Co. v. Oliver, 125 Tenn., 136; Mayberry v. Lilly Mill Co., 112 Tenn., 565; Cole v. Zucarello, 104 Tenn., 65; Gardner v. Deeds & Hisig, 116 Tenn., 128; John Deere Plow Co. v. Shellabarger, 140 Tenn., 123; Ill. Cent. R. Co. v. Johnson & Fleming, 116 Tenn., 624; Chisholm v. U. S. Canopy Co., 111 Tenn., 204; Ill. Cent. R. Co. v. So. Seating & Cabinet Co., 104 Tenn., 568; Clinton Oil & Mfg. Co. v. Carpenter, 113 S. C., 10-19; Palestine Cotton Seed Oil Co. v. Corsicana Cotton Oil Co., 25 Tex. Civ. App., 614; Potomac Bottling Works v. Barber & Co., 103 Md., 509-514; Wertheim v. Chicoutimi Pulp Co., 104 L. T. N. S., 16 Com. Cas., 297; Great Western Ry. Co. v. Redmayne, L. R., 1 C. P., 329; Foss v. Heineman, 144 Wis., 146.

Cases cited and distinguished: Rodocanachi v. Milburn, 18 Q. B. D., 67-77; Williams Bros. v. Agius, 110 L. T. N. S., 865.

4. **APPEAL AND ERROR.** Amendments of pleading are presumed to be authorized in absence of showing to contrary.

Amendments of pleadings are presumed to have been authorized by the chancellor in the proper exercise of his legal discretion, and in furtherance of justice, in the absence of a showing to the contrary. (*Post, p. 471.*)

5. **SALES.** Contract for delivery and payment in installments is regarded as an entirety; ''each month's shipment to stand as separate sale and contract.''

A contract for the delivery of and payment for goods by installments is regarded as an entirety, and a violation of installment terms as to delivery or payment will authorize a rescission of the entire contract, and a provision in such a contract, under the subdivision "Terms," that "each month's shipment is to stand as a separate sale and contract," being referable to payment and method of accounting, cannot be extended so as to divide an otherwise entire contract. (*Post, pp. 472, 473.*)

Cases cited and approved: Cement Co. v. Oliver, 125 Tenn., 138; John Deere Plow Co. v. Shellabarger, 140 Tenn., 123; Foundry Co. v. Wheel Co., 113 Tenn., 370; Norrington v. Wright, 115 U. S., 188.

6. **INTEREST.** Interest as a matter of right is purely statutory.

Interest as a matter of right is purely statutory, and its positive allowance must be confined to those obligations and demands specified in statutory provisions, and in cases not so included, it is a matter of discretion in the jury or chancellor. (*Post, pp.* 473-475.)

7. **SALES.** Refusal to allow interest held not an abuse of discretion.

The refusal of the chancellor to allow interest in buyer's action for seller's breach of contract to deliver goods was not an abuse of discretion, in view of Shannon's Code, sections 3494, 3498. (*Post, pp.* 473-475.)            .

Acts cited and construed: Acts 1786, sec. 5, ch. 4; Acts 1835-36, sec. 2, ch. 50.

Cases cited and approved: Cherry's Ex'rs. v. Mann, 3 Tenn., 269-272; Railroad v. Fort, 112 Tenn., 432; Railroad v. Cabinet Co., 104 Tenn., 568; Williams v. Inman, 45 Tenn., 267.

Codes cited and construed: Sec. 3494 (S.); Sec. 1949 (1858).

----

FROM DAVIDSON.

----

Appeal from the Chancery Court of Davidson County. —HON. JAMES B. NEWMAN, Chancellor.

PITTS & McCONNICO and CHAS. P. HATCHER, for appellants.

JOHN J. VERTREES, WM. O. VERTREES and JOS. M. HARTFIELD, for appellee.

MR. JUSTICE BACHMAN delivered the opinion of the Court.

This suit was instituted by the Tennessee Fertilizer Company to recover damages of the International Agricul-

tural Corporation for the breach of a contract for the sale
and delivery of sulphuric acid. The chancellor decreed
in favor of the complainants, holding that the cancellation
by the seller was unwarranted, and the buyer entitled to
recover the difference between the contract price and mar-
ket price at delivery dates, the amount of damages being
fixed through reference in the sum of $479,788.11. Both
parties have appealed and assigned errors to the decree of
the chancellor.

The facts are as follows: Controlling by contracts the
disposition of all sulphuric acid produced by the Tennes-
see and Ducktown Copper Companies, located respectively
at Copperhill and Isabella, Tenn., the defendant, Interna-
tional Agricultural Corporation, as seller, entered into a
contract, dated May 20, 1912, with the complainant, Ten-
nessee Fertilizer Company, as buyer, whereby it agreed to
deliver to the buyer, beginning October 1, 1912, 50,400
tons of 60 degree Baume sulphuric acid in installments
of 700 tons per month, f. o. b Copperhill in tank cars fur-
nished by the seller. The price fixed was $5.75 per ton
for 25,200 tons to be delivered during the first 36 months
and $6 per ton during the last 36 months, payment to be
made on the 10th of each month for the preceding calen-
dar month's deliveries. The contract is typographically
divided under separate headings, which stipulate the quan-
tity, price, terms, settlements, and weights, and relievable
contingencies agreed upon; under the latter clause it is
provided, among other contingencies, that in the event of
accidents to machinery whereby the parties might be pre-
vented from carrying out the provisions of the contract the
same was to be suspended for such time as was neces-
sary to make repairs. The contract contains no provision

authorizing the seller upon notice to the buyer to dispose of or waste, for the buyer's account, delinquent acid accumulated in the hands of the seller in excess of certain tonnages, as was provided for in the contract between the producer, Tennessee Copper Company and its vendee, the International Agricultural Corporation, dated January 18, 1911.

On June 14, 1912, J. H. Carpenter, president of the Tennessee Fertilizer Company, contracted to sell H. L. Todd and associates, afterwards organized as the Carolina Phosphate Company, 700 tons per month of 50 degree sulphuric acid, for a period of 72 months, beginning October 1, 1912. This contract by its terms does not refer to the contract between complainant and defendant, dated May 20, 1912, nor does it appear that the defendant was apprised thereof until August 22, 1914, when complainant wrote, stating that it had sold the acid to the Carolina Phosphate Company, and insisting upon shipments being made to it. Performance of the contract was begun in October, 1912, the buyer receiving, upon shipping instructions given the seller, acid tonnage largely in excess of the contract provision of 700 tons, which was distributed by the buyer between its own plants and others to whom it had sold the same. Thereafter shipments in varying amounts were made by the seller upon instructions from the buyer, suspensions being requested and complied with without objection, the correspondence disclosing no effort on the part of either party to enforce strict compliance with the contract terms as to the installments to be taken, until August 2, 1913, when the seller notified the buyer that it was delinquent in taking acid and requested shipping instructions.

On August 11, 1913, the seller wrote, calling attention to the delinquent acid and stating that it might be necessary to waste the same for the buyer's account unless ordered out promptly, to which the buyer replied that it did not recognize any right in the seller to waste acid for its account. On August 15 and 18, 1913, the seller again wrote the buyer with reference to delinquencies and in the latter letter again reiterated its position as to the probability of wastage on buyer's account. On September 8, 1913, the following letter was written:

"Atlanta, Ga., September 8, 1913.

"Tennessee Fertilizer Company, Nashville, Tenn.— Gentlemen: It has been our pleasure up to the present time to extend to you the utmost latitude in our dealings with you on sulphuric acid. Specific contract conditions have been largely, if not entirely, ignored, as it did not suit your convenience to follow them. It has been incumbent upon us, however, to stand in the gap and live rigidly up to the terms and conditions of our contract with the Tennessee Copper Company. The result is that we are able to no longer extend to you the courtesies of the past, and we must call upon you to give us definite shipping instructions for the overdue balance of sulphuric acid.

"If you do not give these shipping instructions the results will probably be that the Tennessee Copper Company, unable to store any larger amount of acid in their tanks, will deliberately waste this acid and render us bill for it. As the acid has been sold to you and has been held by us for you up to this time, and if it is now refused by you, we will be compelled to charge you with it, in the event of such wastage. If it were possible to sell this acid in the open market for your account, and lessen your loss by

so doing, that would be our duty, but there appears to be no prospect of that.

"We may be able to rent additional tank cars, have them loaded for you, and held on your side track by you, until you are able to receive the acid and release the cars. In that event, the loss to you would be only the rental of the cars and the demurrage paid on same.

"Briefly, the situation demands heroic treatment, and we must ask you to consider this letter as formal and legal notification of what to expect. We greatly regret the necessity that compels us to write you.

"Yours very truly, [Signed] W. F. Guthrie."

The receipt of this letter was acknowledged by the buyer's representative with the statement that the president had been abroad, but was en route to New York and would advise upon arrival. The buyer thereafter resumed the receipt of acid in irregular monthly amounts until June 23, 1914, when it was notified by the seller that on account of a shutdown for repairs at the plant of the Tennessee Copper Company, to last for a minimum of two weeks, delivery of acid would be suspended in accordance with the terms of the contract. Subsequent to the time designated as the duration of the shutdown at the producer's plant, the buyer directed the resumption of shipments at the rate of 700 tons per month, but was informed that production of acid had not reached normal quantity, and that only one or two cars per week could be allowed it; the buyer again insisted upon deliveries in accordance with the contract terms, and was advised by the seller that shipments would be increased as soon as normal production was restored.

On September 8, 1914, the buyer requested the suspension of shipments until further notice, which was agreed to by the seller. Under date of October 15, 1914, the seller wrote requesting shipping orders on acid due as per contract, and each month thereafter wrote similar notices, tendering acid, in two of which notices the attention of the buyer was again directed to the danger that wastage might become necessary, in which event the seller would look to the buyer for reimbursement for any claim made upon it by the producer. No written response was made to these letters, but it is in evidence that in response to verbal requests made by the vice president of the seller the buyer's president, Mr. Carpenter, stated that the buyer was going to take the acid as fast as it could, and was going to take it all.

The following letter was sent to the buyer on June 4, 1915:

"Atlanta, Ga., June 4, 1915.

"Tennessee Fertilizer Co., Nashville, Tenn.—Gentlemen: We hereby tender you sulphuric acid due you as per the terms of your contract. Kindly furnish us with shipping orders at once, and oblige. Yours very truly, [Signed] W. F. Guthrie."

Reply was made thereto as follows:

"New York, June 11, 1915.

"Mr. F. F. Ward, Asst. Secy., International Agricultural Corporation, 165 Broadway, City—Dear Sir: Please resume shipments of sulphuric acid to the Carolina Phosphate Company, Greenville, S. C., at the rate of 700 tons per month.

"Kindly acknowledge receipt of this, and oblige. Yours very truly, Tennessee Fertilizer Co., [Signed] J. H. Carpenter, President."

Two or three days after the date of the above letter directing resumption of shipments, Mr. Carpenter and Mr. Fleming, presidents of the respective companies, had a conversation in the Vanderbilt Hotel in New York, wherein the former, insisting upon the delivery of acid, was informed by the latter that no further acid would be furnished by the seller, and thereafter, on June 17, 1915, the following letter was forwarded to the buyer:

"General Offices, 165 Broadway.   Telephone
Cortlandt 5806.
"New York, June 17, 1915.

"Tennessee Fertilizer Co., Mr. J. H. Carpenter, President, Nashville, Tennessee—Dear Sir: On account of your frequent and persistent delays and refusals to take the quantity of sulphuric acid which you agreed to take, according to the terms of your contract, dated May 20, 1912, and by reason of the fact that the quantity of approximately 23,000 tons of acid, which you should have taken up to this time, you have in fact taken but approximately 11,000 tons, we are forced to the conclusion that you wish to renounce the contract *in toto,* and therefore elect ourselves to cancel said contract as of this date, without prejudice, however, to whatever rights we have against you by reason of your delinquencies.

"We shall regard the contract from now on as at an end, and shall proceed to take such action as we may be advised is to the best interests of this company. Yours very truly, International Agri. Corporation, ]Signed] S. B. Fleming. President.

"Copy to Mr. J. H. Carpenter, New York."

In addition to the written evidence of the course of dealing between the parties with relation to the contract, as

shown by the correspondence, it appears in the testimony that by reason of the nature of the fertilizer business, due to contingencies regulating the demand for acid in manufacture, together with the difficulty encountered in the storage of the product, it was not the policy of the seller herein to insist upon or demand a strict compliance with the delivery terms of its various contracts, and with the exception of the present instance no forfeiture or cancellation had ever been enforced. It is also shown that in the sprir and summer of 1915 the use of sulphuric acid in the manufacture of munitions developed a new and active market for the product, and in consequence thereof prices began to materially advance.

Upon the foregoing summary of the facts of the case the primary question is, Was the seller within its rights in canceling the contract by its letter of June 17, 1915? We think not. We are of opinion that the case comes squarely within the principle recently announced by this court in the case of *Wildberg Box Co.* v. *Darby,* 143 Tenn., 73, 223 S. W., 855, and authorities enumerated in support of that decision, which may be succinctly stated as an equitable doctrine that where one, entitled by the terms of a contract to a strict compliance with its provisions for the delivery or receipt of goods, acquiesces in a breach thereof, and thereafter expressly or by a course of conduct continues the contract in force, and accepts performance otherwise than contracted for, he will not be permitted to summarily cancel without notice to or knowledge of such intention in the other party, and a reasonable opportunity for performance afforded.

In Black on Rescission and Cancellation (1916 Ed.) vol. 1, section 219, p. 580, it is stated:

"Even where time is made the essence of the contract, this provision may be waived by the party for whose benefit or protection it is inserted, either expressly or by extending the time for payment or performance or by granting indulgence to the other party in this regard; and when such a waiver has been made, he cannot arbitrarily and summarily declare a forfeiture of the contract for delay, but must first demand payment or performance and give the other party a reasonable time and opportunity, after such demand, to comply. Thus, although a purchaser of land has made default in paying agreed installments of the price, yet if the vendor, by his subsequent course of dealing, has led the purchaser to believe that a forfeiture will not be insisted on, he cannot suddenly declare a forfeiture without giving notice and an opportunity to pay the balance due."

In addition to authorities quoted in *Wildberg Box Co.* v. *Darby,* supra, the following are in point: 24 R. C. L., section 563, p. 284; *Gibson* v. *Rouse,* 81 Wash., 102-107, 142 Pac., 464; *Prentiss* v. *Lyons,* 105 La., 382, 29 South., 944; *Taylor* v. *Goelet,* 208 N. Y., 253, 101 N. E., 867, Ann. Cas., 1914D, 284; *Monson* v. *Bragdon,* 159 Ill., 61-67, 42 N. E., 383; *Wilt* v. *Hammond et al.,* 179 Mo. App., 406-413, 165 S. W., 263; *Henningsen* v. *Tonopah, etc., R. Co.,* 33 Nev., 208-257, 111 Pac., 36, 119 Pac., 774, Ann. Cas., 1913D, 1008.

The seller here, by its continued and consistent course of conduct in tendering acid due under the contract, requesting shipping instructions therefor, and repeated notifications to the buyer of the latter's existing obligation under the contract, had kept the same in force and binding upon both parties; the cancellation therefore, with-

out due notice to the buyer of such intended action and specification of a reasonable time in which the buyer might comply with the contract, constituted an actionable breach. There is no question but that the seller might have re-nounced the contract upon the buyer's first default, and it is equally true that by reason of subsequent acceptance of irregular or incomplete performance by the buyer its right to insist upon performance according to contract terms was not irrevocably waived, but, having treated the contract in the manner above indicated, the right to insist upon complete performance, and the right to rescind for deviations or defaults of the buyer, could not be exercised unless and until the latter was duly informed of such in-tention. It is said for the seller that the cancellation was not wrongful, for the reason that on June 4, 1915, when shipping orders were requested by the seller, the buyer then had knowledge of the seller's intention to cancel unless or-ders were forthcoming for all acid due under the contract, and that it was not surprised by the subsequent cancella-tion, neither was the same a sudden departure from the pre-vious course of dealing between the parties. The letter of June 4, 1915, was not, either by its terms or the circum-stances attendant upon its sending, intended as a notifica-tion of the seller's present or future intention to cancel the contract. It was but one of a series of requests for shipping orders, the former absence of reply to which had evoked no intimation of cancellation, but, on the other hand, had elic-ited renewed demands for compliance with the contract. It was sent from the seller's Atlanta office at a time when no course of action in this regard had been agreed upon by the seller's officials in New York, and it cannot be main-tained that the buyer was aware of a course which the sell-

er had not then determined upon. Nor do the telegrams passing between the buyer and the Carolina Phosphate Company, on June 10, 1915, justify the assumption that the former was aware of any contemplated cancellation by the seller; the inquiry is to be considered a most natural one in view of the buyer's contract with the Carolina Phosphate Company for a portion of the acid and the opportunity afforded for advantageous disposal of the same otherwise upon an active rising market.

It is further insisted that the letter of June 4, 1915, was a tender of and request for shipping orders for all delinquent acid then due, 11,000 tons, as well as the 700 ton installment due in June, and that the orders given June 11th, applying only to disposition of the monthly quota, were not in compliance with the tender made, and the seller therefore entitled to cancel as was done on June 17th. In view of the fact that at the time of the tender referred to, the producer did not then have on hand for disposal by the seller sufficient acid to cover the buyer's delinquencies and the inadequacy of facilities for the shipment of so large an amount, it is scarcely to be presumed that the request contemplated shipping orders for all acid due. However this may be, we do not deem the question material, for the reason that, treating the request in either aspect, it wholly fails to give the buyer definite notice of the seller's purpose to cancel, and fixes no time for compliance by the buyer.

The measure of damages applied by the chancellor, the difference between the contract price and the market price, is said to be erroneous, and it is urged that the facts of the case make it an exception to the general rule, and call for the application of another and more equitable measure

of ascertainment, namely, the difference between the con-
tract price and the price at which the buyer had contracted
to sell, plus any damage which the latter by reason of its
failure to deliver, was compelled to pay.  The general rule
by which damages are to be determined for the breach of a
contract like the present one is the difference between the
contract price of the goods and the market prices of the
same at the dates fixed for delivery.  *Cement Co.* v. *Oliver,*
125 Tenn., 136-143, 140 S. W., 595, 38 L. R. A. (N. S.), 416,
Ann. Cas., 1913C, 120; *Mayberry* v. *Lilly Mill Co.,* 112
Tenn., 565, 85 S. W., 401; *Cole* v. *Zucarello,* 104 Tenn., 65,
56 S. W., 850; Sutherland on Damages, section 651, pp.
2273-2277; Elliott on Contracts, vol. 3, section 2027, p. 205.

Under the special circumstances of particular mercan-
tile contracts other admeasurements more nearly approxi-
mate the damages flowing from a breach, and are applied
for their fixation.  Thus for the breach of a contract for
merchandise not *in esse,* but to be manufactured accord-
ing to specifications, the difference between the contract
price and the cost of production, the profit, marks the dam-
age recoverable.  *Gardner* v. *Deeds & Hirsig,* 116 Tenn., 128,
92 S. W., 518, 4 L. R. A. (N. S.), 740, 7 Ann. Cas., 1172;
*John Deere Plow Co.* v. *Shellabarger,* 140 Tenn., 123, 203
S. W., 756.  Likewise, special damages, by exception to
the general rule, are recoverable in an action for breach of
contract when the same are reasonably shown to have been
in the contemplation of both parties at the time of the
execution of the contract, and the same made with refer-
ence thereto. *Ill. Cent. R. Co.* v. *Johnson & Fleming,* 116
Tenn., 624, 632, 94 S. W., 600; *Chisholm* v. *U. S. Canopy
Co.,* 111 Tenn., 204, 77 S. W., 1062; *Ill. Cent. R. Co.* v.
*Southern Seating & Cabinet Co.,* 104 Tenn., 568, 58 S. W.,

303, 50 L. R. A., 729, 78 Am. St. Rep., 933; 2 Sutherland on Damages, sec. 662, pages 2339, 2340.

The basis of the insistence of the seller that the facts of the present case take it without the general rule as to damages and call for the profit plus damage measurement, is the fact of the resale of a part of the acid receivable under the contract, to the Carolina Phosphate Company; it being urged that the contract between buyer and seller was subsequent to and made for the express purpose of fulfilling the buyer's contract with its vendee, and that the extent of the buyer's loss is the profit it would have earned had the seller delivered, together with the sum it had to pay its vendee. Numerous authorities are cited in support of the contention made, but we do not find them applicable to the facts and circumstances of the case here. The buyer's resale contract with its vendee, while having terms in common with or similar to those included in the contract with the seller, was for the sale and delivery of only four-fifths of the amount of acid receivable under the latter contract; no reference is made therein to the original undertaking between buyer and seller, and though it is shown in evidence that the buyer had, prior to the execution of the original contract, contemplated a resale of acid receivable thereunder to the Phosphate Company to be organized, later the Carolina Phosphate Company, the subsale was not made until after the substantial terms of the original contract were agreed upon, by correspondence between buyer and seller, and the same legally binding upon them. However, the main inquiry with reference to the importance of any resale by the buyer is whether the same was in contemplation of the parties at the time of the making of the contract. The record shows that at that

time the seller had no knowledge of any existing or proposed resale by the buyer, the contract was not entered into by the seller with regard to or in furtherance of any undertaking the buyer had or was about to assume, and so far as the evidence discloses the seller was not informed of the buyer's subsale until August 29, 1914, when the latter wrote, insisting upon shipments to the Carolina Phosphate Company. Under these circumstances the disposition of acid by the buyer, and the price received therefor by him, becomes irrelevant upon the question of the measure of the buyer's damage upon default by the seller. 24 R. C. L., section 343, pp. 78, 79; 2 Mechem on Sales, section 1762, pp. 1417, 1418; 17 C. J., section 78, p. 748; *Clinton Oil & Mfg. Co.* v. *Carpenter,* 113 S. C., 10-19, 101 S. E., 47-50; *Palestine Cotton Seed Oil Co.* v. *Corsicana Cotton Oil Co.,* 25 Tex. Civ. App., 614, 61 S. W., 433-436; *Potomac Bottling Works* v. *Barber & Co.,* 103 Md., 509-514, 63 Atl., 1068. Upon the foregoing question in the case of *Rodocanachi* v. *Milburn,* 18 Q. B. D., 67-77, hereafter to be noticed, Lord ESHER, M. R., remarks:

"It is well settled that in an action for nondelivery or nonacceptance of goods under a contract of sale the law does not take into account in estimating the damages anything that is accidental as between the plaintiff and the defendant, as, for instance, an intermediate contract entered into with a third party for the purchase or sale of the goods. It is admitted in this case that, if the plaintiffs had sold the goods for more than the market value before their arrival, they could not recover on the basis of that price, but would be confined to the market price, because the circumstance that they had so sold the goods at a higher price would be an accidental circumstance as between themselves

and the shipowners; but it is said that, as they have sold for a price less than the market price, the market price is not to govern, but the contract price. I think that if the law were so, it would be very unjust."

The soundness of the principle announced in the above case was question in the case of *Williams Bros.* v. *Agius,* 110 L. T. N. S., 865, 7 Brit. R. Cases, 332, coming before the House of Lords in 1914, but the same was therein reaffirmed, Lord MOULTON saying:

"If these were the only facts of the case the contention of the respondents would be precisely that view of the damages in the case of an article purchasable in the market which was negatived by the decision in *Rodocanachi* v. *Milburn,* supra. That case rests on the sound ground that it is immaterial what the buyer is intending to do with the purchased goods. He is entitled to recover the expense of putting himself into the position of having those goods, and this he can do by going into market and purchasing them at the market price. To do so he must pay a sum which is larger than that which he would have had to pay under the contract by the difference between the two prices. This difference is, therefore, the true measure of his loss from the breach, for it is that which it will cost him to put himself in the same position as if the contract had been fulfilled."

For the principle of limitation to profits of resale urged on behalf of the seller, reliance is placed upon the case of *Wertheim* v. *Chicoutimi Pulp Co.,* 104 L. T. N. S., 16 Com. Cas., 297, 7 Brit. Rul. Cas., 315, 21 Am. & Eng. Ann. Cas., 602. The principle therein applied is inapplicable to the facts of the present case, founded as it is upon a refusal or failure to deliver as distinquished from a delayed de-

livery accepted by the vendee. The distinction is clearly made in the opinion of Lord DUNEDIN in the case of *Williams Bros.* v. *Agius,* supra, in the following statement:

"It was, however, argued at your Lordship's bar that the case of *Rodocanachi* v. *Milburn,* supra, was wrongly decided, and it was said to be in conflict with the principles laid down in the recent case before the *Privy Council of Wertheim* v. *Chicoutimi Pulp Co.* (1911) A. C., 301, 80 L. J. P. C. N. S., 91, 104 L. T. N. S., 226, 16 Com. Cas., 297, 48 Scot. L. R., 1090, 21 Ann. Cas., 602. It is certain that Lord Atkinson, who delivered the judgment in that case, did not think that he was going against Rodocanachi's Case, for he says so in terms. Nor, in my mind, is there any discrepancy between the two judgments. Wertheim's Case was a case, not of delivery withheld, but of delivery delayed. The buyer, therefore, got the goods, and the only damage he had suffered was in delay. Now, delay might have prejudiced him; but the amount of prejudice was no longer a matter of speculation, it had been put to the test by the goods being actually sold; and he was rightly, as I think, only held entitled to recover the difference between the market price at the date of due delivery and the price he actually got. But when there is no delivery of the goods the position is quite a different one. The buyer never gets them, and he is entitled to be put in the position in which he would have stood if he had got them at the due date. That position is the position of a man who has goods at the market price of the day—and barring special circumstances, the defaulting seller is neither mulct in damages for the extra profit which the buyer would have got owing to a forward resale at over the market price (*Great Western Ry. Co.* v. *Redmayne* (1866), L. R., 1 C P. 329, 35 L. J.

C. P. N. S., 123, 12 Jur. N. S., 692), nor can he take benefit of the fact that the buyer has made a forward resale at under the market price."

We find in the present case no special facts or circumstances justifying a departure from the general rule for the assessment of damages and the application of the principle insisted upon by the seller, as was done in the case of *Foss* v. *Heineman,* 144 Wis., 146 128 N. W., 881, and the recent case of *Texas Co.* v. *Pensacola Maritime Corporation,* decided by the Court of Appeals for the Fifth Circuit and reported in 279 Fed., 19. In the former case, in estimating the damage occasioned by the seller's breach of contract, the market price was made immaterial by the contract of resale between the buyer and his vendee, wherein the former had protected himself from loss by the agreement to deliver only such goods as were received by him from the original seller; by such agreement there could arise no occasion in which the original buyer could be subjected to the risk of loss incident to the fluctuation of market prices; he had expressly removed one of the fundamental reasons for the general rule of damage ordinarily applicable, and had limited himself to the resale profit. It further appears in the above case that which is not shown here, namely that the original seller was not financially benefited by a breach of the contract to deliver; this is to be regarded in an equitable adjustment between the parties.

In the case of *Texas Co.* v. *Pensacola Maritime Corporation* the contract was for no specified quantity, but obligated the seller to deliver, up to a certain maximum "all of the bunker oil sold by the purchaser [plaintiff] to vessels in the port of Pensacola, Fla., from August 1, 1919, to September 30, 1920." The district court treated the con-

tract, in instructing the jury, as one for the purchase of a specific number of barrels of oil which the seller was bound to deliver, and that the buyer was entitled to recover the difference between the contract price and the market price on such quantity. This was held to be erroneous by the court of appeals because the transaction was not found to be a straight contract of purchase and sale, as held by the district court, but one by which the seller only contracted to furnish the buyer oil resold in a limited and particular market. It is apparent that had the contract been the ordinary mercantile transaction between seller and buyer, the former obligated to delivered a stated quantity of goods to belong to and be disposed of by the latter at its option, the measure of damage applied by the district court would be correct. However, the purpose of the contract was to enable the buyer to resell only for a designated use at a particular place, which purpose was in the contemplation of both parties and with reference to which the contract was expressly entered into. Under such an agreement the damage upon breach is properly said to be in the reasonable contemplation of the parties and limited to the profit of the buyer under his subsale. This case, and those cited in support thereof, with the exception of *Wertheim* v. *Chicoutimi,* heretofore noticed, may be more properly regarded as actions for the recovery of commissions, readily ascertainable by buyer and seller, rather than actions for the breach of the ordinary contracts of merchants wherein the liability incurred and the opportunity for profit afforded are material considerations affecting the amount of recovery. The application of the rule insisted upon by the seller, to the ordinary mercantile contract, such as we deem the present one to be, would tend to impair the sta-

bility and enforceability of such agreements for it may be readily seen that upon a market in advance of contract prices one would be enabled by breach to reap financial benefit to himself at a minimum of liability for damage.

It is argued for the seller that the allegations of the pleadings are insufficient to warrant the decree pronounced by the chancellor, and the same is therefore erroneous, and, further, that the chancellor erred in permitting the amendments to the original bill for the reason that such amendments were repugnant to and inconsistent therewith. Without attempting to discuss the many points forceably presented with regard to the assignments made in this connection, our examination of the pleadings discloses no basis for successful attack thereon. The original bill, while perhaps not so specific nor replete with averments touching the buyer's cause of action as might be proferred, sets out the contract between the parties, and by allegation and inclusion of correspondence charges a consistent course of dealing with reference thereto, which, if substantiated, would not warrant the cancellation of the contract in the manner nor for the reasons attributed to the seller. By the amendments permitted to be made by the chancellor the method adopted by the parties in the performance of the contract is alleged in greater particularity, and additional allegations are presented in respect to the wrongful cancellation by the seller. Any lack of sufficiency of averment in the original bill is fully met by the amendments, which, in the absence of a showing to the contrary, must be presumed to have been authorized by the chancellor in the proper exercise of his legal discretion and in furtherance of justice.

Upon the appeal by the buyer, the question of the severability of the contract is presented. It is a Tennessee contract, and under our authorities is to be regarded as an entirety. Its terms are not ambiguous, nor have the parties by their conduct placed thereon any inconsistent construction. It provides for the sale and delivery of a specified amount of commodity, receivable in installments, which are to be paid for within a time named after delivery. While the authorities disclose inharmonious conclusions relative to the nature of mercantile contracts for the delivery of and payment for goods by installments, the question, as stated in *Cement Co.* v. *Oliver,* 125 Tenn., 138, 140 S. W., 596, 38 L. R. A. (N. S.), 416, Ann. Cas., 1913C, 120, is "no longer a matter for discussion in this State," and in the absence of provisions or mutual construction, showing the undertaking to be in reality a number of distinct, independent contracts, they are held to be entire and not severable, and the violation of installment terms as to delivery or payment will authorize the rescission of the entire contract. *Cement Co.* v. *Oliver,* 125 Tenn., 135-138, 140 S. W., 595, 596 (38 L. R. A. [N. S.], 416, Ann. Cas., 1913C, 120) ; *John Deere Plow Co.* v. *Shellabarger,* 140 Tenn., 123-128, 203 S. W., 756; *Foundry Co.* v. *Wheel Co.,* 113 Tenn., 370, 83 S. W., 167, 68 L. R. A., 829, 3 Ann. Cas., 898; *Norrington* v. *Wright,* 115 U. S., 188, 6 Sup. Ct., 12, 29 L. Ed., 366.

The provision of the instant contract, under the subdivision "Terms," that "each month's shipment to stand as a separate sale and contract," both by reason of inclusion under the particular heading and the wording employed, is referable to payment for acid delivered, and affords the seller, in addition to the right of rescission, his remedy for

nonpayment for deliveries made; the provision is limited to the method of accounting for goods received, and cannot be extended so as to divide an otherwise entire contract.

Error is assigned on behalf of the buyer to the action of the chancellor in refusing to allow interest on the recovery had, and it is contended: First, that under our statutes and constructions thereof, claims of the character here sued on carry interest as a matter of law; second, that if the allowance of interest be held to be discretionary there was a manifest abuse of discretion by the chancellor, and allowance should be had here. We are of opinion that the insistences cannot be maintained. Interest as a matter of right is purely statutory, unknown to the common law (*Cherry's Ex'rs* v. *Mann,* Cooke, 269-272, 5 Am. Dec., 696), and its positive allowance must be confined to those obligations and demands specified and enumerated in statutory provisions. In cases not so included, it remains, as at common law, a matter of discretion in the jury or chancellor, to be allowed or not, according to the facts presented. *Railroad* v. *Fort,* 112 Tenn., 432-455, 80 S. W., 429; *Railroad* v. *Cabinet Co.,* 104 Tenn., 568-581, 58 S. W., 303, 50 L. R. A., 729, 78 Am. St. Rep., 933; *Williams* v. *Inman,* 5 Cold., 267-269. Section 3494 of Shannon's Code provides:

"All bills single, bonds, notes, bills of exchange, and liquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it is expressed that interest is not to accrue until a specific time therein mentioned."

Only those demands named by the positive terms thereof bear interest as a matter of law. Section 3498 of Shan-

non's Code, relied upon on behalf of the buyer as including its demand for interest is as follows:

"The amount upon which interest may computed shall be the sum expressed in the contract; and if the contract be for the payment or delivery of property, or any specific article or articles, the value of the same in dollars, to be ascertained by the triers of the suit, shall be the amount on which interest shall be computed."

The above provision does not undertake to enumerate those demands which shall bear interest, but is confined to the amount upon which interest shall be computed in the event the triers of the suit shall determine that the same should be allowed. It is true that section 5 of chapter 4 of the Acts of 1786, and section 2 of chapter 50 of the Acts of 1835-36, provide that all securities for the payment of property and all specific articles shall bear interest as moneyed contracts, "that is to say, the articles shall be rated by the jury at the time they become due, and interest shall be paid accordingly." But these provisions were enacted into the Code of 1858, section 1949, in form identical with section 3498 of Shannon's Code above construed, which section is to be accepted as the existing declaration of the legislature upon the subject.

Our consideration of the contractual relationship of the respective parties to each other and their conduct with reference to the contract, as shown by the entire record, does not warrant the finding that there was any abuse of discretion by the chancellor in refusing to allow interest, and the assignments in this regard are overruled.

We find no error in the rulings of the chancellor upon the exceptions made by both parties to the report of the master touching the nature and amount of certain sales

of acid considered in arriving at the amount of damages. Without particularizing the contentions of the respective parties relative to the sales considered or those insisted upon, for the same cover an extended field of discussion, our examination of the action of the chancellor and the reasons therefor, as disclosed by his opinions, shows a fair and equitable method of determining the reasonable market prices of acid at appropriate periods and the results obtained are in accord with the right of the case.

The decree of the chancellor is affirmed.

The costs incident to appeal will be divided between the parties.