# DROLL PATENT CORPORATION v. CHATTANOOGA MATTRESS COMPANY.

Eastern Section. February 15, 1930.

Petition for Certiorari denied by Supreme Court, June 28, 1930.

C. C. Moore, of Chattanooga, for appellant.
Allison, Lynch & Phillips, of Chattanooga, for appellee.

PORTRUM, J. The Droll Patent Corporation sues the Chattanooga Mattress Corporation to recover the balance of the purchase price of a "New Droll Roll-edge Machine, Model D," a patent device sold under the trade name.

The Mattress Corporation sues to rescind the contract and recover the payment made under the contract and on the purchase price. The Chancellor granted the Patent Corporation relief and the Mattress Corporation has appealed.

This machine is used in forming and sewing a roll on the edges of mattresses, neatly obscuring its seams and leaving the mattress a finished product. This is a complicated machine, for it is required to press and hold the unfinished mattress in form, catch up, sew and roll its edges while traveling around the mattress. It is composed

of three parts: a table with a track upon which the machine runs in traveling around the mattress; the sewing and rolling machine; and an electric apparatus or overhead revolving swivel, through which the motive power is supplied. Of the three parts the sewing machine is the most complicated and the least perfected. This part was under constant improvement.

The Mattress Corporation had an old model of a machine of this character, which was well worn, and it was interested in the purchase of the improved model. A contract was made for the purchase of Model D at the price of $4,000, of which $100 was paid in cash by check, and an allowance of $1000 was made on the machine in use, which was to be taken in by the seller and for the balance of $2900 a post-dated check was given to take advantage of the five per cent discount allowed for cash. The contract was executed September 12, 1926, and it was provided the new machine was to be delivered "March 1, 1927, and preferably 60-90 later." The mattress company did not think it would need the machine before this date and there was no reason for an earlier delivery, but the old machine began to give so much trouble within a short time that the mattress company began to write and urge the earlier delivery. If a new machine Model D could not be delivered, it asked for the loan of an old machine.

The patent company replied and said it would deliver the machine as early as it could, but it was necessary to fill prior orders before making delivery. The machine was delivered and installed by the seller about March 1, 1927, and the mattress company's old Model C machine was taken in on the purchase price.

On the 8th of March, the mattress company advised the patent company that the machine had stopped running, and on the 9th again advised that the machine had started and stopped and further that it had directed the bank not to pay the post-dated check.

There was a guaranty in the contract that the Patent Corporation would replace any defective parts—exclusive of the electrical apparatus—for a period of ninety days. It had been discovered by experience that certain parts of the new model were weak, and were easily broken, that lint gathered when not carefully operated and jammed the machine and the shuttle frequently broke the thread. The Patent Corporation wanted to replace the defective parts with the improved parts as soon as they could be manufactured. This appears to have been satisfactory to the Mattress Corporation, but a long delay followed. Much correspondence took place. It was finally agreed a new machine with its improvements would be sent to replace the machine which had been delivered in March.

On May 9th, the mattress company wrote:

"Naturally, we would prefer having one of your new machines at the earliest possible date. However, we will rock along with the one we now have—."

The Patent Corporation had been replacing parts as they broke and the mattress company was able to "rock along" with the machine, but the company had agreed to replace this machine with the improved Model D as early as possible. The Patent Corporation called attention to their duty to supply prior customers first, and called attention to the fact that these customers had complied with their contracts by payment, while the mattress company had declined to make its payment. On May 31st, the mattress company notified the Patent Corporation it could not get the machine to work, and in a reply it was suggested that the machine be shipped back. On July 25th the machine was returned. On July 26th the Patent Corporation wrote:

"Within a few days we will have a new machine to forward to you and will arrange to have our mechanic install same immediately upon its arrival."

The next letter in the record was one written by the Patent Corporation of December 13th, enclosing an invoice, and stating the machine had been shipped. Upon receipt of it, the mattress company sent this telegram:

"Your invoice. Do not ship Roll Edge Machine. See you January in Chicago."

The Patent Corporation replied, stating it had already shipped the machine, and in response to this, the mattress company wrote:

"From your recent letters back in the summer, we understood that the machine would be shipped out in the early fall. As you did not ship out then and we did not hear anything further from you, we did not know what you were going to do and we made our plans to finish our work by hand and obliged ourselves to several mattress finishers.

"We feel that you should have let us know when you were going to ship the machine so we could have prepared ourselves. We wish to be fair to you and if we can possibly arrange to use the machine, we will do so. However, we cannot tell you definitely just now what we will do."

When the machine arrived, the mattress company received the freight, took it out of the depot and stored it.

The representative of the mattress company met the representative of the Patent Corporation in Chicago at the Annual Bedding Convention and the matter of acceptance was deferred until the mattress company's representative could confer with his brother and father in Chattanooga about the matter. After his return and the conference, the mattress company wrote in part:

"As we promised them (mattress finishers) permanent work last fall, we do not feel that we can lay them off now, during the extreme slow business season and we therefore have decided that we will not have you install the machine. It is in the original crate and we will be glad for you to furnish us shipping instructions on it. You may send us our old style type machine, and also check for $100, which we deposited on this one and when we are in position to have a Model D installed, we will then take it up with you at that time. You no doubt know that we were very much inconvenienced by your failure to deliver Model D machine when you promised you would."

At and from this time the mattress company took a definite stand and the litigation followed. It is insisted the foregoing facts (which we view as the material facts) entitle the mattress company to enforce a rescission of the contract.

The Uniform Sales Law provides:

Shannon's Sup. Code, Sec. 3670a80 (Acts 1919, Ch. 118, Sec. 69) "Remedies for breach of warranty.— (1) Where there is a breach of warranty by the seller, the buyer may, at his election:

"(a) Accept or keep the goods and set up against the seller the breach of warranty by way of recoupment in diminution or extinction of the price;

"(b) Accept or keep the goods and maintain an action against the seller for damages for the breach of warranty;

"(c) Refuse to accept the goods, if the property therein has not passed and maintain an action against the seller for damages for the breach of warranty;

"(d) Rescind the contract to sell or the sale and refuse to receive the goods, or if the goods have already been received, return them to the seller and recover the price or any part thereof which has been paid.

"(2) When the buyer has claimed and been granted a remedy in any one of these ways, no other remedy can thereafter be granted.

"(3) Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepts the goods, or if he fails to notify the seller within a reasonable time of the election to rescind, or if he fails to return or to offer to return the goods to the seller in substantially as good condition as they were at the time the property was transferred to the buyer. . . ."

In this case, the buyer insists: (1) there was a breach of warranty when the machine would not do the work it was sold and purchased to do; and there arose a right to elect to rescind. (2) When the seller agreed to answer for the breach by the replacement of a new and improved machine, immediately (July 26), with knowledge of the consequence of delay to the buyer, it made time the es-

sence of the agreement, and a condition to performance, and this condition was breached by the long delay of about five months, which gave rise to a new election to rescind. (3) That the right of election to rescind was not lost by delay.

The Patent Corporation asserts:

(1) There was no implied warranty in the sale because (a) it was a patented machine, (b) there was an express warranty of replacement of· defective parts and it fulfilled it by the exchange of a new machine; (2) That time was not made the essence of the agreement to furnish the new machine immediately because that would amount to the making of a new contract which was not supported by a consideration; (3) and the buyer precluded its right to rescind by its failure to give notice requiring performance within a reasonable time; and (4) it lost its right to rescind, if it existed, by accepting the machine with knowledge of the facts.

The buyer rejoins—Since time was the essence of the contract and this condition was breached, no notice to comply, after the seller had lost the right to comply, was necessary. And its acceptance of the machine, with knowledge of the breach, was not made as a compliance with the contract but for the purpose of seizing the property to enable it to enforce the lien given by the Sales act for that part of the purchase price paid; and in any event a Court of Equity will not enforce the rules of law when harsh and therefore will grant it relief notwithstanding its acceptance of the machine with knowledge of the breach.

We will now dispose of these contentions. There was no implied warranty for the expressed warranty made one unnecessary, and the expressed warranty contained the intention of the parties. The seller undertook to perform its warranty by replacement, first, by the parts and finally the entire machine. In July it agreed to replace the machine immediately and requested the return of the old machine. Only the head or complicated part of the machine was returned—as expected—the table and electrical apparatus was retained awaiting the new machine. If time became the essence of the contract by this agreement then we think it supported by a consideration, for it was made in performance of the warranty. But in the letter of the mattress company, written in December and after the machine was shipped, the mattress company said it understood from the correspondence in the summer that the machine was to be delivered in the early fall. If this was the understanding, the mattress company cannot complain at a failure to deliver in July, and assert the failure as a breach. By this understanding the date of the delivery became indefinite, and time was not the essence of the contract. The mattress company evidently concurred in deferring the date of the delivery to the early fall, after the promise to make

immediate delivery, otherwise there would have been no understanding; so it then became the duty of the mattress company to give notice for delivery in a reasonable time before it could insist upon a breach of the contract (Tenn. Fertilizer Co. v. International Agricultural Corp., 146 Tenn., 451, 243 S. W., 81). And it has been held that where the date of the delivery is indefinite, then before the buyer can rescind, he must give notice and allow a reasonable time for delivery. Lebanon Valley Iron & Steel Co. v. Anderson Ship Building & Docks Corp., 279 Fed., 859, 13 C. J., 618; 6 Ruling Case Law, 932.

But notice sometimes becomes unnecessary because of the conduct of the parties (Hennessey v. Bacon, 137 U. S., 78, 11 Sup. Ct., 17, 34 L. Ed., 605). Here the buyer expected delivery in the early fall, it retained two of the three parts of the machine and made no demand for the return of that portion of the price paid. There was nothing—except its silence—to indicate it did not expect to accept the machine when shipped. And it did accept it and paid the freight charges. The Sales Act above quoted says the buyer cannot accept the goods with knowledge of the breach and assert a right to rescind. But it is said the property was taken in charge for the purpose of enforcement of the lien for the purchase price. It is not necessary to decide that a buyer can in fact make such a qualified acceptance, for the buyer in this case did not make up its mind to elect and rescind until a long time after its acceptance. And when it did decide to rescind it asked the seller for shipping instructions.

Courts of equity relieve against hardships, as where a buyer is rendered unable to return the purchased article through no fault of his, then the court will grant relief notwithstanding the provision of the statute requiring the return of the goods purchased before rescission, but where the buyer knows the facts but is unable to make up his mind, there is no relief obtainable.

We find no error in the judgment of the lower court, and its decree is affirmed with costs.

Snodgrass and Thompson, JJ., concur.