# SOUTHERN COAL COMPANY, INC. v. E. B. SMITH, et al.

Western Section. July 1, 1930.

Kyser & Allen and W. E. Krafft, of Memphis, for appellant.
W. H. Fisher, of Memphis, for appellee.

HEISKELL, J.   This suit was brought by the Southern Coal Company against E. B. Smith, C. R. Heaney and W. Minter, as partners doing business under the name of Minter Coal Company. It develops later that W. Minter is the sole owner of the Minter Coal Company and he it was who filed answer for the defendants and filed the cross-bill and now is the appellant; he acquired all interest of the other two parties.

The original bill was filed in the Chancery Court of Shelby County on December 17, 1928. It seeks to recover damages for the refusal

of appellant to accept delivery of ten cars of coal shipped, as the bill claimed, on October 1, 1927, in pursuance of a purchase order referred to in the bill as a written order, which appellant placed with the appellee on September 10, 1927, for 150 cars of coal at $1.50 per ton to be shipped to appellant in Chicago, Ill. The bill states that on October 3rd appellee received a letter requesting cancellation of the order and that it cancelled same but it had on October 1st already shipped ten cars and refused to accept cancellation on these ten cars, and that it notified appellant to this effect and later re-sold the ten cars after sustaining a loss of decline in market price, demurrage, and re-consignment charges, all which loss amounted to $314.69.

The written contract being called for and produced by complainant to the defendant, W. Minter filed an answer and cross-bill, admitting the contract and the letter of October 1, 1927, and the further correspondence. The answer denies that the ten cars, the basis of the suit, were shipped on October 1st, but avers that they were shipped on October 3rd after the letter of defendant dated October 1st had been received.

The defendant as cross-complainant, then sets up that he was a coal dealer, which was known to complainant, as was also the fact that in coal contracts time and rate of shipment are very important elements. The cross-bill alleges that on the strength of the contract with the Southern Coal Company, defendant had re-sold the coal so ordered to the Fleming Coal Company of Chicago, Ill. at a contract price of $1.55 per ton and was required to deliver at the rate of ten cars per day, and in order to comply with said Fleming Coal Co. contract, defendant was compelled to purchase other coal to supplement the coal shipped by complainant, because of complainant's failure to ship ten cars a day according to the contract, and had to pay from $1.60 to $1.90 per ton, whereby cross-complainant lost $1240.09. That complainant shipped to defendant from September 12th to 29th inclusive, only 65 cars, thereby breaching its contract.

The answer of complainant to the cross-bill admits that the coal was not shipped at the rate of ten cars per day but that no complaint was made. On the contrary shipments made were accepted and paid for by defendant without protest. It is denied that cross-defendant had any knowledge of the contract with the Fleming Coal Company. Except as to the cars already shipped by October 1st the Southern Company does not object to the cancellation of the contract.

The Chancellor found as facts (1) That the ten cars of coal made the basis of the original bill were shipped on October 1, 1927, before defendant's letter of that date demanding cancellation had

been received. (2) That defendant did not complain of complainant's failure to ship ten cars a day and made no demand for a strict compliance. (3) That complainant knew nothing about the Fleming Coal Co. contract. The Court by the decree, granted complainant a recovery for the amount sued for and dismissed the cross-bill. The defendant has appealed.

The second and third assignments of error insist it was error for the Chancellor to find that the defendant did not complain of the failure of the Southern Coal Company to ship the ten cars per day and made no demand for a strict compliance with this provision of the contract. This is the chief determinative fact in the case and it is therefore important to conclude whether or not the finding of the Chancellor is in accord with or contrary to the evidence.

H. Rutstein, witness for complainant, is assistant sales manager of the Southern Coal Co. was familiar with this contract; knew about the letter of cancellation of October 1st, and acted for the Southern Company in the correspondence following. He says the Minter Coal Company made no complaint. But counsel for Minter says this proves nothing except that Rutstein did not know of the demand made and the brief contains this: "Minter and his clerk both testify that every day and more than once a day they were demanding performance, calling for shipment of the full complement of ten cars a day." (Tr. 129-130, 159-161).

The first reference is to the testimony of W. Minter who after explaining the transaction with the Fleming Coal Co. says:

"Q. 69. Did the Fleming Coal Company insist upon your fulfilling your contract with them? A. Absolutely.

"Q. 70. Did they insist on the time element, the ten cars a day? A. They did.

"Q. 71. If you had failed to ship ten cars a day do you know what would have been the result? A. Yes.

"Q. 72. What would have been the result? A. They would have bought it for our account. That is what they told us they did for the Southern Coal Company when they failed to ship to them.

"Q. 73. Did you insist with the Southern Coal Company. upon their fulfilling their contract, being your number 573, with reference to the time element; that is, shipping ten cars a day? A. Our office did, yes, sir. We called them repeatedly for the car numbers and they gave us first one excuse and then another.

"Q. 74. Did you insist upon ten cars a day A. Well, not specifically ten cars a day, but we wanted them on that average rate.

"Q. 75. At an average of ten cars a day? A. Yes, sir.

"Q. 76. Did you insist upon that? A. Yes.

"Mr. Krafft: What is the answer to that question?

"Q. 77. Did you insist on an average of ten cars a day? A. Yes, sir, we wanted them then; we wanted shipment made according to the order.

"Q. 78. How many times did you call them? A. Well, we were talking to them most every day by telephone.

"Q. 79. Do you know who talked at the other end of the line for the Southern Coal Company? A. Well, I didn't see him, of course, and I didn't do much of the talking myself, but I know who the boys said was talking. They said it was Mr. Brady and Mr. Brown. They would call them to give us numbers, and would ask them about these other numbers. We got the numbers,—always got the numbers on the high price cars, but the numbers on the cheap price cars were always slow.

"Q. 80. Were the Southern Coal Company filling the high priced order? A. They were.

"Q. 81. Were they falling short on the low priced order? A. They were.

"Q. 82. Who in your office did the talking principally? A. Well, Mr. Smith did some of the talking, and Mr. Heaney did some of it, and Mr. W. C. Persons did some of it.

"Q. 83. Where is Mr. Heany now? A. He is with the Southern Coal Company.

"Q. 84. Where is Mr. Smith? A. He is in Memphis. He is not in the coal business.

"Q. 85. Where is Mr. Persons? A. He is working with us."

The clerk referred to is W. C. Persons, who says:

"Q. 44. Did you make demand upon the Southern Coal Company in behalf of your company, the Minter Coal Company, for fulfillment of order 573? A. Yes, I called Mr. Brady and Mr. Brown.

"Q. 45. Who are Mr. Brady and Mr. Brown? A. Well, Mr. Brown, I believe he calls himself the order clerk, the best I know. Mr. Brady is assistant to Mr. Frick.

"Q. 46. Of what company? A. The Southern Coal Co.

"Q. 47. And Mr. Brady and Mr. Brown were both with the Southern Coal Co.? A. Yes.

"Q. 48. How did you get them by phone? What phone number did you call? A. 6-1244.

"Q. 49. Was that the phone number listed for the Southern Coal Company in Memphis? A. Yes, sir, it has been listed in the telephone book for several years.

"Q. 50. Southern Coal Co. of Memphis?

"Q. 51. You called that phone number? A. Yes, sir.

"Q. 52. And talked to Mr. Brady and Mr. Brown? A. Yes, sir.

"Q. 53. How often would you call? A. Every day.

"Q. 54. Did you make demand every day on this order No. 573? A. Yes, sir, I asked them if they had any car numbers to apply on this order?

"Q. 55. What would they say? A. If they had them they would give them to me, and if they didn't, they would say no.

"Q. 56. Did you ever write the Southern Coal Company, making demand? A. No, sir, I didn't write them.

"Q. 57. Why not? A. It is not customary in the coal business, in the brokerage business, to write for car numbers.

"Q. 58. What is the customary communication? A. It is customary in the coal business, brokerage business in the City of Memphis, and I have been in it for twelve years, that whenever you have a car of coal consigned to your company to a certain point, they will call you and give you the number or send you a manifest card on it.

"Q. 59. Was the telephone the usual means of communication? A. Yes, sir, absolutely.

"Q 60. Did any one else from your office call the Southern Coal Company about that same matter? A. Yes, sir, Mr. Minter called and Mr. Heaney called."

Counsel for defendant call attention to the failure of complainant to call Brady and Brown as witnesses, but then defendant does not put Smith or Heaney on the stand. The question depends then upon the testimony of three witnesses, Rutstein, evidently the principal man in the office of complainant, at least so far as this contract is concerned, who says he never heard of any complaint, and Minter and Persons. Minter says if he had not delivered ten cars a day to the Fleming Coal Co. they would have bought it for his account. He then admits that he did not insist on ten cars a day from the Southern, but only an average. Then being asked to whom he talked, he says the boys told him it was Brady and Brown they were talking to. That is, Minter does not say he talked to any one, says he did not do much talking himself and only knows what the boys told him and the only one of the boys called on to testify is Persons. Minter admits that no demand was made in writing before the letter of October 1, 1927. We cannot find from his testimony that he complained to any one by phone or made any demand that ten cars a day be delivered.

If defendant's contention is made out then, it must be by the testimony of W. C. Persons, and all we can extract from his testimony is that he called Brady and Brown every day and asked if they had any car numbers that day to apply on the order. If they

had they would give them; if they had none they would say "No". Take this testimony of Persons on one side and that of Rutstein on the other, that he never heard of any complaint and they are reconcilable on the theory that Persons was simply inquiring for information to learn whether any cars were to be shipped that day and if so, to get the numbers. Not complaining, not demanding, simply inquiring. Besides this is in accord with reason and common sense. Persons was a clerk at $100 per month. Brady and Brown seem to have been of about the same grade in the Southern office. Disputes over contracts are not left to men of this kind. Minter and Rutstein are the men who would naturally take up a controversy of this character and when Minter concluded to terminate the contract, we find him and Rutstein dealing with the matter, not Persons, Brady and Brown.

We think the Chancellor was warranted in finding that no complaint was made by defendant of the rate of delivery of cars and no demand that ten cars per day be delivered, therefore down to the 1st of October strict compliance with the contract was waived and this rule applies:

"Where one, entitled by the terms of a contract to a strict compliance with its provisions for the delivery or receipt of goods, acquiesces in a breach thereof, and thereafter expressly or by a course of conduct continues the contract in force, and accepts performance otherwise than contracted for, he will not be permitted to summarily cancel without notice to or knowledge of such intention in the other party, and a reasonable opportunity for performance afforded." Wildberg Box Co. v. Darby, 143 Tenn., 73, 223 S. W. 855; Tennessee Fertilizer Co. v. Int. Agr. Corp., 146 Tenn., 460.

That is to say, in order to cancel the said contract, Minter would have been obliged to give the Southern Coal Company a reasonable time after notice of cancellation, within which to comply with the contract. The first notice was the letter of October 1, 1927. This gave no time for compliance. Complainant does not object to the cancellation but does object to defendant being allowed any damages and does insist on defendant paying for the ten cars shipped on October 1st. In both contentions complainant is right. We do not consider it necessary to discuss the number of cases cited for defendant, because we think they are not in point. If the Southern Coal Company had refused to delivery any more coal before the defendant had declared a cancellation, then defendant could have recovered damages for the breach.

If the defendant, when complainant first failed to ship the ten cars on any day had notified complainant that he would buy in the market, or would hold complainant to a strict compliance and had

kept this up, then defendant could have recovered for the breach, but when Minter admits that he only expected an average of ten cars per day and then does not insist on that, but allows the deliveries to be made as they were without complaint and without demand for strict compliance, he cannot then declare a cancellation without giving reasonable time for compliance. When Minter failed to do this, he lost on both original and cross-bill. He lost the right to hold complainant liable for a breach, and he became liable for the cars shipped before cancellation. The cases referred to above, settle these results.

Minter does not produce the Fleming contract. He does not give the date nor the time when it began. He says the last shipment on it was September 29th and the last ten cars accepted from the Southern went into this. He says if he had failed any day to ship ten cars to the Fleming Co. it would have purchased in the market and charged the difference in price to him. He was so much afraid of this that he secured coal at $1.90 to ship to the Fleming Company and yet he had a contract with the Southern at $1.50 and did not demand daily shipments of ten cars. To say the least, Minter should have given clearer evidence as to the Fleming contract. This also is significant, on October 1, 1927, the strike in Illinois that had been keeping up the price of coal was settled and the decline set in. Minter wrote the letter of cancellation the same day.

The loss on the ten cars in controversy was $314. Minter was through with the Fleming Company. We are impressed with the view that Minter thinking he was dealing on a declining market, received the coal from the Southern as fast as he cared to get it, and received as much as he cared to get, and took advantage of what he considered the first opportunity to get rid of the contract. The only mistake he made was one of law.

Assignments 3, 4 and 5 have been answered already. The Court held, not that complainant had complied with the contract, but that Minter had waived non-compliance and could not declare a forfeiture to take effect instantly. The theory of defendant is that complainant in failing to ship ten cars per day had breached the contract and was not entitled to any notice that compliance was demanded or any time to comply. For the reasons given we do not agree to this contention.

Assignment 6 is that the court erred in finding that appellee was never advised of the Fleming contract and that the terms of said contract are not shown. The brief does not state that any notice of this contract was given to appellee and Rutstein swears there was none. The only reference to the record does not show any such notice.

Assignments 9, 10 and 11 relate to this Fleming contract. Minter would not produce the contract and the Court would not allow testi-

mony in regard to it. There was no error in this. Besides, the failure to produce the Fleming contract, the receiving of the cars as shipped without protest, the decline in price of coal and the cancellation on October 1st and the refusal to accept the ten cars shipped on October 1st are calculated to create the suspicion that Minter did not want any more coal from the Southern Coal Company than he received. If Minter had told the Southern Company that he had a contract to deliver ten cars per day, and that he must have ten cars every day to fill his contract, this case would be very different, especially if the Fleming contract were shown in the record and appeared to be as asserted.

Assignment 7 is to the effect that it was error to hold that the ten cars which Minter refused to receive were sold promptly by the Southern Company. No error is shown in this.

Assignments 12 and 13 are based upon the ruling of the Court on objections to testimony. We find that no error is shown by these assignments.

All assignments of error are overruled and the decree is affirmed. Appellant and surety will pay the costs of appeal.

Owen and Senter, JJ., concur.